Filed 12/5/25  P. v. Lampkin CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C100215 |
| v. | (Super. Ct. No. CRF99-0000320) |
| LEON LAMPKIN, JR., | |
| Defendant and Appellant. | |

In March 1998, defendant Leon Lampkin, Jr., participated in a home invasion attempted robbery of two drug dealers.  The record indicates that the robbery was planned by Michael Owens, an older gang member just out of prison, who supplied weapons for the robbery and told defendant, who was younger and just out of youth detention, that he needed to stand there with the shotgun and possibly translate.  When the drug dealers resisted the robbery, Owens directed defendant to get out of the way.  Defendant jumped out a window, and Owens fired at the drug dealers, killing them.

A jury convicted defendant on two counts of special circumstance felony murder, two counts of attempted robbery, one count of burglary, and one count of possession

of a short-barreled shotgun. The jury found that defendant personally and intentionally used a firearm, but did not personally and intentionally discharge the firearm. The trial court sentenced defendant to state prison for two consecutive terms of life without the possibility of parole (LWOP) plus a determinate term of 37 years. Following a remand from this court for resentencing (see *People v. Lampkin* (Mar. 20, 2002, C034676) [nonpub. opn.]), the trial court sentenced defendant to two consecutive LWOP terms plus a determinate term of 20 years.

In February 2019, defendant filed a petition for resentencing under Penal Code section 1172.6.[1] After the trial court summarily denied the petition, this court reversed and remanded the matter with directions to appoint counsel for defendant and conduct further proceedings. (*People v. Lampkin* (Jan. 31, 2023, C089258) [nonpub. opn.].) Thereafter, the trial court held an evidentiary hearing and denied the petition, ruling defendant could presently be convicted of felony murder as a major participant in the attempted armed robberies who acted with reckless indifference to human life.

Defendant now contends there is insufficient evidence to support the trial court's reckless indifference finding. He also raises a claim of evidentiary error. Because we agree the evidence is insufficient to support the reckless indifference finding, we will reverse the trial court's order denying the petition and remand the matter to the trial court with directions to grant the petition, vacate defendant's murder convictions, and resentence him on the remaining counts. Our conclusion makes it unnecessary to address defendant's claim of evidentiary error.

---

[1] Undesignated statutory references are to the Penal Code. Defendant's petition was filed under former section 1170.95. Effective June 30, 2022, that section was renumbered section 1172.6 without change to the text. (Stats. 2022, ch. 58, § 10.) We will refer to the current statute.

BACKGROUND

Owens testified at the evidentiary hearing, providing a detailed account of the events that unfolded inside the home of brothers Alejandro and Leoncio Jimenez. Our recitation of the relevant facts is based on Owens's testimony and corroborating evidence contained in the reporter's transcript from the underlying trial, which was also admitted into evidence by the trial court.[2]

Owens decided to rob the Jimenez brothers sometime after he was paroled from prison in November 1996. He knew they were drug dealers. Owens wanted to commit a home invasion robbery and knew he could not do so alone, so he thought about who he could "talk into helping." Owens had known defendant since childhood and thought he could "manipulate him" into helping. Owens explained that defendant was younger, and Owens had "influence" with him because Owens "was fresh out of prison," which gave him a reputation and "misguided respect," especially to someone like defendant, who had been released from youth detention. Owens decided to use that as "leverage" to convince defendant to participate in the planned robbery. Owens said he was a gang member and wanted to recruit defendant into his gang. He told defendant that he made money committing robberies and defendant could make money doing security work; Owens said defendant had to have his back during the planned robbery. He told defendant he "needed him to just, just basically stand there" and possibly translate in the event that the Jimenez brothers did not understand English. Defendant agreed.

Owens's plan was to enter the Jimenez home with firearms and take whatever drugs, money, and weapons they had at the house. He supplied a Ruger 9-millimeter semiautomatic pistol and a short-barreled shotgun for the robbery, and he prepared

---

[2] Although not part of our review, the People also relied on certain portions of two preliminary hearing transcripts, which were admitted into evidence by the trial court. Those portions are largely duplicative of trial testimony.

"robbery kits" in two backpacks containing items such as duct tape, gloves, bandannas, a hammer, and ammunition. Owens made the kits without defendant's knowledge or assistance and kept them in a locked filing cabinet at his son's mother's house. Defendant was not involved in planning the robbery.

On March 18, 1998, Owens picked up the robbery kits, then waited for nightfall. Around 8:00 p.m., Owens picked up defendant at his apartment. A couple hours later, while driving to the street where the Jimenez brothers lived, Owens told defendant the robbery "was going to be smooth." Owens said they would go in "real quick." He repeated that defendant might need to translate, but as soon as they learned where the drugs and money were located, they would "grab it and [get] out." Defendant responded: "Man, I don't want to go back to jail." Owens "told him he wouldn't."

Owens parked in a friend's driveway and told the friend's husband he was leaving the car there for a few minutes but "would be right back." After handing defendant the shotgun, Owens tucked the pistol into his waistband and carried both backpacks as they walked the short distance to the Jimenez house. Explaining his rationale for defendant being armed, Owens said: "I thought that the robbery would go smoother if he had a gun too because people don't resist when you have guns."

At the house, Owens stashed the backpacks along the side of the house and told defendant to follow his lead when they got inside. The front door was open and the screen door was unlocked, allowing easy entry. Owens pulled out his pistol as he entered. Defendant followed him through the doorway with the shotgun across his body, parallel with the floor. Leoncio was seated on a couch in the living room area. Owens motioned with his pistol for Leoncio to move deeper into the house, and Leoncio moved toward the dining area where Alejandro was seated at a table. A Colt .45-caliber semiautomatic pistol was on the table. Defendant approached Alejandro with the shotgun trained on him.

4

Owens demanded: "Tell us where your drugs and money are kept." Defendant translated. Leoncio responded in Spanish and stepped toward Owens with his chest out, at which point "it got chaotic very fast." Owens struck Leoncio in the head with his pistol and heard "scuffling" behind him. Alejandro had grabbed defendant's shotgun and was trying to take it from him. As they struggled over the shotgun, the weapon discharged into a wall. Hearing the shotgun blast, Owens turned toward Alejandro and yelled for defendant to "get out of the way." Owens intended to shoot Alejandro, but before Owens could do so, Leoncio, having apparently grabbed the pistol that was on the dining table, shot Owens in the stomach. Owens fell to the floor as defendant jumped through a window with the shotgun. Owens said he heard the glass shatter and saw the lower half of defendant's body as he exited the house through the window. Owens returned fire, was shot a second time by Leoncio, but ultimately shot and killed both Jimenez brothers.

Owens was transported to the hospital and treated for his gunshot wounds. Of the 12 expended shell casings found inside the house, nine were fired by Owens' pistol and three were fired by the .45-caliber pistol

## DISCUSSION

Defendant contends the evidence is insufficient to support the trial court's finding that he acted with reckless indifference to human life when he participated in the attempted armed robbery of the Jimenez brothers.

### A

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) Section 189 describes a number of unlawful killings that are statutorily defined as "murder of the first degree," including a killing "committed in the perpetration of, or attempt to perpetrate, [certain listed felonies, including] robbery." (§ 189, subd. (a).) This form of first degree murder, known as first degree felony murder, does not require malice. Prior to Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate

5

Bill 1437), " 'the only criminal intent required [was] the specific intent to commit the particular felony.' " (*People v. Dillon* (1983) 34 Cal.3d 441, 475.)

Effective January 1, 2019, Senate Bill 1437 amended the felony-murder rule to provide, in relevant part: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ." (§ 189, subd. (e).)

Here, defendant was charged with murder based on a felony-murder theory. He was not the actual killer. The evidence conclusively establishes that Owens fired the fatal shots. And there is no evidence defendant intended for Owens to kill either Alejandro or Leoncio. Thus, in order to affirm the trial court's order denying defendant's resentencing petition, there must be substantial evidence that he was a major participant in the attempted robbery and that he acted with reckless indifference to human life. Defendant challenges only the reckless indifference finding.

"The principles of substantial evidence review are well settled. 'Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for " 'substantial evidence—that is, evidence which is reasonable, credible, and of solid value' " that would support a finding beyond a reasonable doubt.' [Citation.] We must 'review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] . . . [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the

6

reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citation.]" (*People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)

B

The major participation and reckless indifference requirements contained in section 190.2, subdivision (d), and incorporated into the felony-murder rule by Senate Bill 1437, "codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137, which articulates the constitutional limits on executing felony murderers who did not personally kill. *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782, collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).)

At one end of the spectrum is a defendant like Enmund, who planned and participated, as the getaway driver, in an armed robbery that resulted in the unplanned murder of the robbery victim and his wife. The *Enmund* court "found a broad consensus against imposing death in cases 'where the defendant did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.' [Citation.]" (*Banks, supra*, 61 Cal.4th at p. 799.) At the other end of the spectrum are "actual killers and those who attempted or intended to kill." (*Id*. at p. 800.) In between these extremes, but falling on the permissible side of the constitutional line, are defendants like the Tison brothers, who "helped plan and carry out the escape of two convicted murderers from prison," including their father, who "was serving a life sentence for killing a guard in the course of a previous escape." (*Id*. at p. 802.) The Tison brothers brought "a cache of weapons to prison, arm[ed] both murderers, and [held] at gunpoint guards and visitors alike." (*Ibid*.) During their subsequent escape, they

7

carjacked and kidnapped a family of four, took the family's possessions, and the convicted murderers "then killed all four family members." (*Id*. at p. 799.) Although the Tison brothers did not kill or intend to kill, their " 'major participation in the felony committed, combined with reckless indifference to human life, [was] sufficient to satisfy the *Enmund* culpability requirement.' [Citation.]" (*Id*. at p. 800.)

Elaborating on the reckless indifference requirement, the California Supreme Court has explained that " '[r]eckless indifference to human life is "implicit in knowingly engaging in criminal activities known to carry a grave risk of death." ' [Citation.]" (*People v. Emanuel* (2025) 17 Cal.5th 867, 883 (*Emanuel*).) "The defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks, supra*, 61 Cal.4th at p. 801.) Moreover, the major participation and reckless indifference elements are interrelated such that " 'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.' " (*People v. Clark* (2016) 63 Cal.4th 522, 614 (*Clark*), quoting *Tison v. Arizona, supra*, 481 U.S. at p. 153.) However, even significant participation does not necessarily entail possession of the requisite mental state. (*Clark*, at p. 617.) Instead, reckless indifference " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' [Citation.]" (*Emanuel, supra*, 17 Cal.5th at p. 883.)

" 'The degree of risk to human life is crucial to the analysis.' [Citation.] As the United States Supreme Court has acknowledged, ' "the possibility of bloodshed is inherent in the commission of any violent felony," ' such that one who perpetrates or attempts to perpetrate such a crime may well anticipate 'the use of lethal force as a *possibility*.' [Citation.] Were that degree of culpability sufficient, however, it would amount to ' "little more than a restatement" ' of the former felony-murder rule that Senate Bill No. 1437 retired. [Citation.] ' "Awareness of no more than the foreseeable risk of

death inherent in any [violent felony] is insufficient" to establish reckless indifference to human life; "only knowingly creating a 'grave risk of death' " satisfies the statutory requirement.' [Citation.]" (*Emanuel*, *supra*, 17 Cal.5th at p. 884.)  In determining whether defendant acted with reckless indifference, "[w]e analyze the totality of the circumstances" using the following factors derived from *Clark*:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677; see *Emanuel*, *supra*, 17 Cal.5th at pp. 884-885.)  In addition to the *Clark* factors, the Courts of Appeal have held an additional relevant factor militates against a finding of reckless indifference: a defendant's youth at the time of the crime.  (See, e.g., *People v. Jimenez* (2024) 103 Cal.App.5th 994, 1002-1004 (*Jimenez*); *People v. Keel* (2022) 84 Cal.App.5th 546, 562 (*Keel*); *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 (*Ramirez*); *In re Moore* (2021) 68 Cal.App.5th 434, 453 (*Moore*).)

C

With the foregoing factors in mind, we conclude the evidence in this case is not sufficient to support the trial court's finding that defendant acted with reckless indifference to human life.

The first *Clark* factor admittedly cuts against defendant.  He knew a gun would be used by Owens, and he personally used a gun of his own, although there is no evidence that he knew about the weapons until Owens handed the shotgun to him after parking the car down the street from the Jimenez house.  However, in discussing this factor, the court in *Clark* stated:  "The mere fact of a defendant's awareness that a gun will be used in the

9

felony is not sufficient to establish reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at p. 618.) Still, although not enough by itself, "[a] defendant's *use* of a firearm . . . can be significant to the analysis." (*Ibid*.)

The second factor is neutral. Although defendant was physically present at the scene of the attempted robbery in the moments immediately preceding the murders, as the court in *Clark* explained, physical presence is "particularly significant" in a case like *Tison*, where the murder was "a culmination or a foreseeable result of several intermediate steps, or where the participant who personally commits the murder exhibits behavior tending to suggest a willingness to use lethal force. In such cases, 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' [Citation.]" (*Clark, supra*, 63 Cal.4th at p. 619.)

Here, the murders were sudden and unexpected. Despite defendant's presence at the scene of the attempted robbery, there is no evidence he had influence over Owens or that he could have acted as a restraining influence on him. When Leoncio and Alejandro unexpectedly resisted, Owens directed defendant to get out of the way, and defendant jumped out the window. Except for the shotgun blast, which the jury concluded was not an intentional discharge, defendant was not in the house when any of the shots were fired. As the *Emanuel* court stated, "where a crime unfolds quickly, this factor — the failure to restrain a cohort — cannot be said to weigh in favor of a finding of reckless indifference without some evidence in the record indicating that the defendant had a meaningful opportunity to do so. [Citation.] This requires some awareness of the risk of impending lethal violence and time to react." (*Emanuel, supra*, 17 Cal.5th at p. 892; see *Keel, supra*, 84 Cal.App.5th at p. 560 [factor was neutral where decision to shoot was made quickly in response to unexpected resistance].) Moreover, although presence at the scene and

10

failure to render aid to the victim was noted in *Tison*, defendant's act of jumping through a window, cutting himself in the process, seems more reconcilable with fear than with callous indifference. There is also no evidence that returning to the house to render aid would have done any good. Like in *Clark*, and unlike in *Tison*, it is "difficult to infer [defendant's] frame of mind concerning [the Jimenez brothers'] death[s]" from the fact that he jumped through a window and ran when Owens told him to get out of the way. (*Clark, supra*, 63 Cal.4th at p. 620.)

The third factor, duration of the felony, weighs in defendant's favor. There was no "prolonged period of restraint" creating " 'a greater window of opportunity for violence' [citation], possibly culminating in murder." (*Clark, supra*, 63 Cal.4th at p. 620.) The plan was to "go in . . . real quick," locate the drugs or money, "grab it and [get] out." Defendant's role was to "post up" with the shotgun and translate if necessary. Within moments of their entry, the Jimenez brothers resisted and the fatal consequences unfolded. This factor does not suggest reckless indifference to human life on the part of defendant.

The fourth factor, whether defendant possessed knowledge of Owens's likelihood of killing, also militates against a finding of reckless indifference. There is no evidence defendant possessed such knowledge. Although he arguably knew that Owens was a gang member who was recently paroled from prison, that alone does not supply the necessary knowledge to support this factor. (See *In re Taylor* (2019) 34 Cal.App.5th 543, 558 ["decisions have refused to attribute significance to prior criminal activity that did not involve *deadly* violence"]; *In re Miller* (2017) 14 Cal.App.5th 960, 976 [this factor is not supported even though defendant and the killer "belonged to the same gang and had committed follow-home robberies together in the past"].)

The final *Clark* factor is defendant's effort to minimize the risk of violence during the robbery. This factor was relevant in *Clark* primarily because the defendant "was the principal planner and instigator of the robbery," so his "apparent efforts to minimize the

11

risk of violence" inherent in his robbery plan were "relevant to the reckless indifference to human life analysis." (*Clark, supra*, 63 Cal.4th at p. 622.) Here, defendant did not engage in any planning activity. As in *In re Ramirez* (2019) 32 Cal.App.5th 384, defendant acquiesced in Owens's robbery plan after Owens used his influence to convince him to participate. Although Owens did not make any effort to minimize the risk, we have found no cases using the planner's lack of risk minimization as evidence that a non-planning defendant acted with reckless indifference to human life. We conclude this factor does not cut one way or the other.

Finally, defendant's youth also cuts against a finding of reckless indifference. In *Moore, supra*, 68 Cal.App.5th 434, discussing the culpability of a minor defendant, the court stated: "To the extent the *Clark* factors discussed *ante* support a finding of reckless indifference for an adult—an issue we do not decide today—those factors undoubtedly preclude such a finding when viewed from the lens of Moore's youth. In particular, we cannot conclude beyond a reasonable doubt that Moore was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Id*. at p. 454.)

Although *Moore* involved a minor, youthfulness as a factor relevant to a criminal defendant's ability to perceive risk and consequences, and to the level of culpability, has been extended to defendants in their late teens and early twenties. (*People v. Pittman* (2023) 96 Cal.App.5th 400, 416-417 [21-year-old defendant]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1092-1093 [20-year-old defendant]; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 586 [18-year-old defendant].) Moreover, in extending youth offender parole provisions to offenders as old as 25 years of age when they committed their crimes (see Stats. 2017, ch. 675, § 1), "the Legislature cited '[r]ecent neurological research show[ing] that cognitive brain development continues well beyond age 18 and into early adulthood.' [Citations.]" (*In re Williams* (2020) 57 Cal.App.5th 427, 432.)

Defendant was 23 years old. In *People v. Oliver* (2023) 90 Cal.App.5th 466, the appellate court declined to decide whether a 23-year-old defendant "fit the definition of

'youthful' " because any assumed error in failing to consider youth as a factor "was harmless because there was no evidence that Oliver's criminal behavior was motivated by impulsivity or vulnerability to peer pressure, two hallmarks of youthful offenders." (*Jimenez, supra*, 103 Cal.App.5th at p. 1003, quoting *Oliver*, at pp. 488-489.)  Here, Owens's testimony supports a conclusion that defendant was susceptible to his influence as an older gang member fresh out of prison.  Owens thought he could manipulate defendant into helping.  Owens used the respect he believed defendant had for him as leverage to convince defendant to participate in the planned robbery.  Although defendant was 23 years old, his vulnerability to manipulation from an older gang member makes his youth a relevant factor in this case.  Such youth " 'diminishes any inference he acted with reckless disregard for human life' during the armed robbery" (*Keel, supra*, 84 Cal.App.5th at p. 562, quoting *Ramirez, supra*, 71 Cal.App.5th at p. 990) by making it less likely he "was subjectively aware that his actions created a graver risk of death than any other armed robbery." (*Moore, supra*, 68 Cal.App.5th at p. 454.)

We recognize that a home invasion robbery of a drug dealer is a particularly dangerous variety of armed robbery.  (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1013.)  Defendant participated in such a robbery while armed with a loaded shotgun and used that shotgun to support Owens's role as lead robber.  However, the facts of this case are distinguishable from those in *McDowell*, where the appellate court found sufficient evidence of reckless indifference to human life but acknowledged the case "may be close to the line." (*Id*. at p. 1015.)  In *McDowell*, both participants planned the robbery, whereas here, defendant was not involved in planning, he followed Owens's plan.  This case is also different because Owens used defendant's youth to manipulate him into participating.  And unlike in *McDowell*, here there was no window of opportunity for defendant to intercede when Owens started shooting.  Defendant was outside the house, having jumped through the window, when the fatal shots were fired.  If *McDowell* was

13

" 'close to the line,' " which the *Emanuel* court did not dispute when discussing the case (*Emanuel, supra*, 17 Cal.5th at p. 890), this case falls on the other side of the line.

## DISPOSITION

The order denying defendant's petition to vacate his murder convictions and for resentencing is reversed.  The matter is remanded to the trial court with directions to grant the petition, vacate defendant's murder convictions, and resentence him on the remaining counts.


　　　　　　　　　　　　　　　　_____/S/_____
　　　　　　　　　　　　　　　　MAURO, J.


We concur:


\_\_\_\_\_/S/_____
EARL, P. J.


\_\_\_\_\_/S/_____
DUARTE, J.